## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Andre J. B.,

              Plaintiff,

v.

Kilolo Kijakazi, Acting Commissioner
of Social Security,

              Defendant.

Case No. 20-cv-02320 (SRN/HB)

**REPORT AND RECOMMENDATION**

---

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Andre J. B. seeks judicial review of a final decision by the Commissioner of Social Security denying his application for supplemental security income. This matter is before the Court on the parties' cross-motions for summary judgment [ECF Nos. 27, 29], which were referred to the undersigned for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that the Commissioner's decision be reversed and the matter be remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff filed an application for Supplemental Security Income (SSI) on October

26, 2017.  (R. 15[1].)  Plaintiff's application was denied at the initial and reconsideration

levels.  (R. 15.)  Plaintiff and a vocational expert testified before an Administrative Law

Judge (ALJ) on July 8, 2019.  (R. 35-54.)  On March 23, 2020, the ALJ issued a decision

finding that Plaintiff was not disabled.  (R. 15-28.)  The Appeals Council denied

Plaintiff's request for review without substantive analysis.  (R. 1-3.)

### B.    Relevant Records

The Court will recount the record evidence only to the extent it is helpful for

context or necessary for resolution of the specific issues presented in the parties' motions.

Plaintiff challenges the legal adequacy of certain steps of the ALJ's determination, not

the evidentiary sufficiency of the ALJ's factual findings.  Therefore, the Court does not

recount any medical or other evidence in the record.  The Court instead provides only a

brief overview of the ALJ's determination and recounts relevant portions of the hearing

transcript and the determination when discussing Plaintiff's arguments.

The ALJ follows a five-step sequential evaluation process for determining

disability for SSI.  20 C.F.R. § 416.920(a)(4).  The five steps are: (1) whether the

claimant's work activity, if any, is substantial gainful activity; (2) whether the claimant

has any severe, medically determinable impairments meeting the duration requirement;

(3) whether one or more of those impairments meets or medically equals the criteria of a

listed impairment; (4) whether the claimant's residual functional capacity (RFC)[2] allows

---

[1]  The Court cites the Social Security Administrative Record as "R." and uses the
pagination that appears in bold in the lower right corner of each page.
[2] RFC measures the most a claimant can still do in a work setting, despite limitations
caused by his impairments.  20 C.F.R. § 404.1545(a)(1).

her to do past relevant work; and (5) whether the claimant's RFC and age, education, and work experience allow her to adjust to other available work. *Id.* (a)(4)(i)–(v). If the ALJ determines at any step that the claimant is disabled or not disabled, the ALJ halts the evaluation. *Id.* (a)(4).

The ALJ found at step one of the evaluation process that Plaintiff had not engaged in substantial gainful activity since October 26, 2017. (R. 18.) At step two the ALJ found that Plaintiff had the following severe impairments: deformity of the left talus; osteoarthritis of the left ankle and right subtalar joint status post open reduction and internal fixation of the right foot an and heal and left heel; moderate degenerative changes to the left middle foot; alcohol dependence; antisocial personality disorder; posttraumatic stress syndrome; major depressive disorder; and anxiety disorder. (R. 18.) At step three the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19.) At the start of step four, the ALJ found that Plaintiff had the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), with the following limitations:

- can sit for 6 hours and stand and/or walk 2 hours;
- can occasionally use bilateral foot controls;
- can occasionally push and pull with bilateral lower extremities;
- can frequently stoop, kneel, and crouch;
- can occasionally climb ramps and stairs, balance, and crawl;
- never climb ladders, ropes, and scaffolds;
- never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle;

- avoid concentrated exposure to uneven surfaces;
- can understand, remember, and carry out simple, routine tasks;
- never perform fast pace tasks;
- can occasionally and superficially interact with others. "Superficially interact" is defined as work that does not involve any work tasks such as arbitration, negotiation, confrontation, being responsible for safety of others, or directing work of others; and
- can occasionally tolerate changes in a routine work setting.

(R. 24.)  At step four, the ALJ found Plaintiff had no past relevant work.  (R. 26.)  At step five, the ALJ found Plaintiff could perform work in other occupations with sufficient jobs in the national economy, and therefore determined that he was not disabled.  (R. 26.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to determining whether the ALJ made a legal error and whether substantial evidence in the record as a whole supports the decision.  *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021); 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted).  "Substantial evidence in the record as a whole requires a more searching review than the substantial evidence standard." *Grindley*, 9 F.4th at 627; Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  A court must consider evidence that fairly detracts from the ALJ's decision. *Grindley*, 9 F.4th at 627.  But a court may not "reweigh" the evidence or reverse the ALJ's decision "merely because substantial evidence would have supported an opposite decision." *Id.*  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from

the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.*  A court will disturb the ALJ's decision only if it finds from the evidence as a whole that the decision "falls outside the available zone of choice." *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021).

A court must also ensure the ALJ adequately explained her findings and conclusions.  The ALJ's determination must indicate which evidence the ALJ relied on and which she rejected, and her reasons for doing so, but she need not cite specific facts supporting specific findings and conclusions.  *See Vance v. Berryhill*, 860 F.3d 1114, 1117–18 (8th Cir. 2017) (holding ALJ's findings at step four cured lack of elaboration at step three); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (holding that the ALJ need not discuss every piece of evidence and not citing evidence does not indicate the ALJ did not consider it).  But "inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand" if they might change the outcome of the determination; an ALJ, not a reviewing court, must resolve those issues.  *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005).  *See also Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822–23 (8th Cir. 2008) (reversing when the ALJ's factual findings were insufficient for the court to conclude whether substantial evidence supported the determination); *David S. v. Saul*, No. 19-CV-3137 (ADM/LIB), 2021 WL 467348, at *3 (D. Minn. Jan. 25, 2021), report and recommendation adopted, 2021 WL 465281 (D. Minn. Feb. 9, 2021) ("a reviewing court cannot search the record to find other grounds to support the decision of the ALJ" when the decision does not provide that support) (cleaned up).

## III.    DISCUSSION

Plaintiff argues that the ALJ's determination that he was not disabled suffered from two substantive errors: (1) she inexplicably omitted key limitations from the RFC (and, as a result, from the hypothetical question to the vocational expert) even though she had found persuasive the medical opinions that contained those limitations; and (2) she failed to explain why she applied a Medical-Vocational Grid rule applicable to light work rather than the lower grid rule applicable to sedentary work when Plaintiff's residual functional capacity (RFC) fell between light and sedentary work.  He alternatively argues the case should be remanded because the ALJ lacked the constitutional authority to decide his application.

### A.    Plaintiff's Substantive Challenges to the ALJ's Disability Determination

#### 1.    Whether the ALJ Erroneously Failed to Include Exertional Standing/Walking Limitations in the RFC and the Hypothetical Posed to the Vocational Expert

Plaintiff argues the ALJ erred by failing to include, both in the RFC and in the corresponding hypothetical question she asked the vocational expert, certain limitations on how long he could stand or walk at a time that were included in medical opinions the ALJ found persuasive and on which she had relied in forming the RFC.  (Pl's Mem. at 7.) Specifically, Plaintiff points to the ALJ's discussion of opinions from treating provider Mindy Benton, DPM, and consultative examiner Ward Jankus, M.D., both of whom had examined Plaintiff several times over the years and had opined about the effect of the degenerative conditions in his lower extremities on his ability to stand or walk over the

course of a workday.  (R. 23–25.)  As recounted by the ALJ, Benton opined that

Plaintiff's "advanced significant post-traumatic arthritis will prevent him from being able

to stand and work on his feet/ankles all day." (R. 23, referring to R. 404.)  The ALJ found

"this opinion persuasive in finding the claimant can only stand or walk for two hours of

an eight-hour workday."  (*Id.*)

The ALJ also recounted Jankus's opinions.  Jankus opined in November 2017 that

"it would be safe to assume [Plaintiff] probably does need to be off his feet more than he

is on his feet out of an eight-hour span.  I would think something in the range of three

hours give or take an hour total really is about the best he can do and that is in bits and

pieces." (R. 24.)  The ALJ also quoted Jankus as stating after a February 2020

examination that "[Plaintiff's] walking tolerance may be about six blocks or perhaps 20

minutes or so," and his "standing tolerance might be about an hour and then he is going

to need probably a 20- to 30-minute break to let the ankles recuperate."  (*Id.*)  Altogether,

Jankus opined that Plaintiff's own estimate that out of an eight-hour span "he might be up

to about three total [standing and/or walking] all in bits and pieces" was a reasonable one.

(*Id.*)  Jankus also filled out a questionnaire stating that Plaintiff could "stand for one hour

of an eight-hour workday; walk for 20 minutes; walk and stand for a total of three hours

combined of an eight-hour workday."  (*Id.* at 25.)  The ALJ stated that she "[found] these

opinions persuasive," without identifying any respects in which she did not endorse them.

(*Id.*)

The ALJ also found persuasive the opinions of two State agency medical

consultants, Dr. Stevens and Dr. Richards, whom she described has having determined

Plaintiff retained the capacity to "perform at the light exertional level with standing and walking for two hours of an eight-hour workday." (*Id.*)  Neither discussed a more specific limitation on the duration of standing or walking at any given time.

Notwithstanding the ALJ's finding that Jankus's opinions were persuasive, however, the limitation she adopted in the RFC, and which she included in the hypothetical to the vocational expert, only identified a cumulative two-hour total of walking and standing in a workday, and did not specify any limits on how long Plaintiff could walk or stand at any one time.  Plaintiff argues the ALJ erred is omitting the additional specific limits endorsed by Jankus and Benton.  The Court finds Plaintiff's argument as to Benton is off the mark because Plaintiff cites to no opinion by Benton that purports to impose a specific limitation on how long Plaintiff could stand or walk at a time.  But Jankus did, and therefore the Court turns to whether the ALJ erred in failing to include—or explain adequately the exclusion of—his more specific limitations in his opinion.

The Commissioner points out that an ALJ is not required to address each and every part of a medical opinion to show that the entire opinion was properly considered; nor adopt all of an opinion simply because she finds one part of it persuasive.  (Def's Mem. at 26.)  Thus, in *McClure v. Saul*, No. 1:20-CV-150-SNLJ, 2021 WL 3856577, at *7 (E.D. Mo. Aug. 30, 2021), the court rejected the plaintiff's argument that the ALJ failed to include in the RFC all the mental limitations from a psychiatrist's opinion the ALJ had found persuasive where the ALJ had accurately captured the impact of those limitations using different language than that used in the opinion.  *See also Owens v.*

8

*Saul*, No. 19-00402-CV-NKL, 2020 WL 2319880, at *5 (W.D. Mo. May 11, 2020) (finding the same). And in *Salih v. Colvin*, No. 4:11CV3218, 2013 WL 1411694, at *2 (D. Neb. Apr. 8, 2013), the court held the ALJ did not need to "mechanically list and reject every possible limitation" in determining the RFC so long as it was clear from the determination that she reviewed the evidence for potential limitations.

But the reasoning and outcome of those decisions are not applicable here. Plaintiff's challenge is not that the ALJ failed to endorse or explicitly discard every limitation in Jankus's opinions, but that after finding the opinions "persuasive," without qualification or exclusion, specifically on the subject of Plaintiff's limited walking/standing ability, the ALJ did not include the full extent of those limitations in her hypothetical to the vocational expert, or explain why she had chosen not to do so.

The Commissioner argues that Jankus's opinion that Plaintiff could only stand for one hour at a time and walk for 20 minutes at a time lacks evidentiary support because it is inconsistent with the findings of intact strength and normal lower extremity muscle testing. (Def's Mem. at 27.) But the ALJ specifically discussed the parts of the opinions limiting Plaintiff to continuous standing for one hour and walking for 20 minutes, and found the opinions were generally consistent with the state agency consultants, imaging, and treatment records. (R. 24–25.) The ALJ never cited lower extremity strength as evidence that supported greater walking/standing ability, and the record reviewed by the ALJ speaks to limitations caused by degenerating mobility, bone growth, deformities, and arthritis in Plaintiff's ankles and feet, not a lack of muscle strength. (R. 21–26.)

Thus, the reasoning of the ALJ offers no insight as to why she failed to include in the RFC and in the hypothetical question the additional limitations on continuous standing and walking after she explicitly acknowledged the opinions contained those limits, were consistent with the rest of the evidence, and were persuasive on Plaintiff's ability to stand/walk. For that matter, it is not even clear whether she *deliberately* excluded these limitations or simply overlooked them when she described the RFC and then framed the hypothetical question to the expert. In any event, in the absence of an explanation, the Court cannot conclude that the RFC correctly incorporated all of Plaintiff's limitations.

As a result, it cannot conclude that the vocational expert's testimony affords substantial evidence to support the ALJ's step five finding. "A hypothetical question is sufficient if it sets forth the impairments which are accepted as true by the ALJ." *Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quotation omitted). Further, "[i]n order to constitute substantial evidence, a vocational expert's testimony must be based on a hypothetical that captures the 'concrete consequences' of the claimant's deficiencies." *Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)). Here, for the reasons described, the Court cannot conclude that the RFC "captured the concrete consequences" of Plaintiff's impairments.

Accordingly, the Court recommends that the case be remanded with instructions to the ALJ to reconsider whether additional limitations on standing/walking consistent with the opinions of Dr. Jankus should be included in the RFC and, if not, to explain their omission; (2) if necessary, to put a new hypothetical question to the vocational expert;

and (3) based on the resulting testimony, to reconsider the finding at step five that Plaintiff was not disabled.

> ### 2. Whether the ALJ Used the Wrong Medical-Vocational Grid or Failed to Explain Adequately Her Choice to Apply One Grid Rather Than Another

Plaintiff contends the ALJ used the wrong Medical-Vocational Rule and/or failed to explain sufficiently her choice and use of the Medical-Vocational Rules, and that the case should be remanded because the choice made a difference in the ultimate determination of whether Plaintiff was disabled. (Pl's Mem. at 5.) Some explanation of the Medical-Vocational Rules and their use would provide helpful context for assessing Plaintiff's arguments.

At step five, an ALJ determines whether there are jobs available in sufficient numbers in the national economy that a claimant can work based on his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c). The ALJ must use the Medical-Vocational Rules in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (often referred to as the "grids" or "grid rules") for analyzing whether a claimant is disabled; the grids are selected based on a claimant's maximum ability for strength-based exertion (sedentary, light, medium, or heavy and very heavy). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 200.00(a), (c), 201.00, 202.00; *Titles II & XVI: Determining Capability to Do Other Work - the Med.-Vocational Rules of Appendix 2*, SSR 83-10, 1983 WL 31251 at *2 (S.S.A. 1983). Once a grid is selected, the ALJ must examine a claimant's age, education, and work experience to determine whether they fit within any of the rules directing a conclusion of disabled or not disabled. *See, e.g.,* 20 C.F.R. Pt. 404, Subpt. P,

App. 2, § 201.14.  When a claimant's exertional limit falls between two grids (or a claimant also has nonexertional limits), the ALJ must make a determination "on the basis of the principles and definitions in the regulations," consultation with a vocational source, and using the grids that closely approximate the facts as a framework.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(d); 20 C.F.R. § 404.1569a(d); *Titles II & XVI: Capability to Do Other Work - The Medical-Vocational Rules As A Framework for Evaluating Exertional Limitations Within A Range of Work or Between Ranges of Work*, SSR 83-12, 1983 WL 31253 at *2 (S.S.A. 1983).

The physical exertion requirement measures the most strength-based exertion a claimant can put forth, accounting for actions like lifting, carrying, walking, standing, pushing, and pulling.  *See* 20 C.F.R. § 404.1567.  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a). "'Occasionally' means . . . up to one-third of the time. . . . [A]t the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.  SSR 83-10, 1983 WL 31251 at *5 (S.S.A. 1983).

By comparison,

> Light work involves lifting no more than 20 pounds at a time
> with frequent lifting or carrying of objects weighing up to 10
> pounds. Even though the weight lifted may be very little, a job
> is in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with some

pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

SSR 83-10, 1983 WL 31251 at *6 (S.S.A. 1983). "[T]he primary difference between sedentary and most light jobs" is that light work requires "a good deal of walking or standing." *Id.* *5.

Here, the ALJ explained that if Plaintiff were capable of full light work, Rules 202.13 and 202.20 would direct a finding of not disabled, but instead, Plaintiff's RFC fell between light and sedentary work. (R. 27.) The ALJ asked the vocational expert whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. (R. 27, 49–50.) The vocational expert testified that such an individual could perform work as an inspector and hand packager, DOT[3] number 559.687-074, assembler, plastic hospital products, DOT number 712.687-010, and

---

[3] DOT is the Dictionary of Occupational Titles, which SSA relies on for information about the requirements of occupations.

assembler, electrical accessories, DOT number 729.687-010.  (R. 50.)  The expert explained that to the extent there was a conflict between the RFC limits for sitting and standing versus what the DOT suggested about the requirements of these occupations as light work, "[t]he jobs that I identified, bench assembly jobs, in my opinion is based on my experience having done job analysis and labor market surveys for those jobs."  (R. 53.)  The ALJ adopted the expert's testimony about the occupations as well as the explanation of how the conflict was resolved, and found Plaintiff not disabled.  (R. 27–28.)

The choice to place Plaintiff's RFC above sedentary was outcome-determinative for a portion of Plaintiff's disability period.  Plaintiff was born on May 27, 1969.  (R. 170.)  He was forty-eight years old on his alleged onset date of October 26, 2017, and fifty years old when the ALJ issued her decision.  (R. 28.)  He had no past relevant work experience, and at least a high school education but no recent education allowing for movement into skilled work.  (R. 26.)  For the period Plaintiff was closely approaching advanced aged (50–55 years old), Rule 201.12 in the sedentary grid would have directed a finding of disabled for an individual with Plaintiff's education and work experience.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.12.  But for the period when Plaintiff was a younger individual (45–49 years old), the sedentary grid would not direct a finding, nor would the light work grid regardless of Plaintiff's age, because the non-exertional limits in the RFC would require the ALJ to analyze them in combination with the exertional limits to determine if Plaintiff was disabled (as the ALJ did here).  Therefore, the ALJ's finding that Plaintiff had a RFC for a reduced range of light work rather than sedentary

14

work impacted the determination of disability for when he was closely approaching advanced age.

Plaintiff acknowledges that his RFC fell between the grid from Medical-Vocational Rule 202 and the grid from Rule 201, but complains that the ALJ improperly applied the Rule 202 grid even though the exertional restrictions in Plaintiff's RFC most closely corresponded with sedentary work (i.e., Rule 201). Plaintiff argues that the ALJ should have applied the Rule 201 grid. (Pl's Mem. at 5–6.) The Commissioner responds that the ALJ did not use either grid; rather she correctly determined that although Plaintiff was not capable of the full range of light work, he was not so limited that he could only do sedentary work. Thus, she appropriately considered a vocational expert's testimony instead of using the grids. (Def's Mem. at 21–23, 27–28.) Assuming solely for the sake of this discussion that the RFC was correct, the Court agrees with the Commissioner that the ALJ proceeded correctly.

The ALJ found Plaintiff capable of light work without any limit on weight-lifting or carrying, which would implicitly include the frequent weight-lifting and carrying required for full range light work. *See Campbell v. Astrue*, Civil Action No. 09-5356, 2010 WL 4689521, at *5, n. 6 (E.D. Pa. Nov. 2, 2010) (finding an ALJ implicitly found claimant could carry 10 pounds when the ALJ found claimant capable of light work and made no mention of any weight-carrying limit in the RFC). But "frequent lifting or carrying requires being on one's feet up to two-thirds of a workday or more." SSR 83-10, 1983 WL 31251 at *6 (S.S.A. 1983). Thus, while the ALJ determined Plaintiff had full upper body strength and could lift the amount of weight required for full range light

work, the two-hour standing/walking restriction found by the ALJ would limit Plaintiff to lifting and carrying for less than half the duration required for the frequent lifting and carrying involved in light work, thus setting up a potential conflict in the ALJ's RFC. *See Coleman v. Berryhill*, No. 4:16-CV-1546-SNLJ, 2017 WL 6407476, at *5 (E.D. Mo. Dec. 15, 2017) (recognizing this conflict as an error in a RFC); *Campbell*, 2010 WL 4689521, at *5, n. 6 (E.D. Pa. Nov. 2, 2010). On the other hand, Plaintiff also has the capacity to occasionally use bilateral foot controls and occasionally push and pull with bilateral lower extremities, and there are seated light work jobs requiring "some pushing and pulling of . . . leg controls." SSR 83-10, 1983 WL 31251 at *5 (S.S.A. 1983). In any event, it is undisputed that Plaintiff's abilities are quite eroded from the full range light work base and his limitations would foreclose many light jobs.

At the same time, Plaintiff retains some capacity greater than sedentary work. Plaintiff can lift more than the maximum 10 pounds for sedentary work (although he likely cannot carry/move 10 pounds with the frequency required for light work). He can frequently stoop, kneel, and crouch, and he has no limit on hand-arm operation of controls. Plaintiff's RFC therefore includes capacity for some subset of light work involving these activities, so it is not purely sedentary.

There are conflicting court rulings on the question of the proper exertional category and associated grid rules in cases very similar to this one. *Compare Torres v. Berryhill*, Civil No. 15-4416 (JRT/TNL), 2017 WL 1194198, at *3 (D. Minn. Mar. 30, 2017) (concluding restriction to walking 2 hours and sitting 6 hours a day was consistent with RFC somewhere between light and sedentary work), *Esping v. Berryhill*, Civil No.

16

17-872 (FLN), 2018 WL 3383433, at *6 (D. Minn. July 11, 2018) (same), and *Coleman*,

2017 WL 6407476, at *5–6 (E.D. Mo. Dec. 15, 2017) (finding substantial evidence

supported claimant's abilities falling between sedentary and light, despite the RFC

limiting claimant to 2 hours of standing/walking and failing to address implied limits on

lifting and carrying weight), *with Campbell*, 2010 WL 4689521, at *5 (E.D. Pa. Nov. 2,

2010) (finding a RFC for a reduced range of light work was contradictory when it stated

claimant could frequently lift or carry 10 pounds but limited claimant to standing or

walking for no more than one to two hours), and *Wilkerson v. Comm'r of Soc. Sec.*, 278

F. Supp. 3d 956, 973–74 (E.D. Mich. 2017) (remanding because the ALJ failed to

consider necessary connection between a 2 hour walking/standing limit and a limit on

lifting/carrying required for full light work, and failed to address the necessary

lifting/carrying limit in the hypothetical to the vocational expert.)

Though both lines of cases offer well-reasoned arguments, the Court is persuaded

by the reasoning employed by other courts in this district and other districts in this circuit,

which reviewed the RFC for substantial evidence to support the choice of reduced range

of light exertion rather than purely sedentary exertion.  Again, assuming solely for the

sake of this discussion that the RFC was correct in its characterization of Plaintiff's

limitations on standing/walking, the Court concludes that substantial evidence would

support the ALJ's finding that Plaintiff's RFC falls between light and sedentary.  *See*

*Esping*, 2018 WL 3383433, at *6 (D. Minn. July 11, 2018); *Coleman*, 2017 WL 6407476,

at *5–6 (E.D. Mo. Dec. 15, 2017).

Plaintiff argues in the alternative that even if the RFC falls between light and sedentary, the Social Security Administration's Program Operations Manual System (POMS) requires the ALJ to explain why she applied one grid rule over another when the claimant's RFC falls between two grid rules that direct opposite conclusions.  (Pl's Mem. at 9.)  Specifically, Plaintiff argues that his RFC fell between Rule 201.12, which directs a finding of disabled based on his medical-vocational profile, and Rule 202.13, which directs a finding of not disabled.  (Pl's Mem. at 9.)  Plaintiff then argues POM DI 25025.015(D) required the ALJ to seek the aid of a vocational expert to determine which grid rule was most appropriate to determine the outcome, and to explain her choice in the determination.

POM DI 25025.015(D) provides:

> [d]etermining whether a claimant is disabled is a more difficult judgment when his or her exertional capacity falls in the middle of two rules and the rules direct opposite conclusions. In this situation apply the:
>
> • higher-numbered rule and find the claimant not disabled if you conclude the claimant has a slightly reduced capacity for the higher level of exertion; or
>
> • lower-numbered rule and find the claimant disabled if you conclude the claimant has a significantly reduced capacity for the higher level of exertion.
>
> NOTE: Use the information about the sedentary, light, and medium occupational bases found in the Medical-Vocational Quick Reference Guide in DI 25001.001 to assist you with this adjudicative judgment.
>
> IMPORTANT: Always explain the basis of your conclusions.
>
> If necessary, use the assistance of a Vocational Specialist to determine which rule most closely approximates the claimant's

> RFC and vocational factors of age, education, and past work experience.

But POM DI 25025.015(D) does not address the situation when a claimant's exertional capacity is somewhere between slightly and significantly reduced. *Esping*, 2018 WL 3383433, at *7 (D. Minn. July 11, 2018). Instead, SSR 83-12 directs that when the exertional capacity is somewhere in the middle of two grid rules, the ALJ should consult a vocational source to determine whether a claimant is capable of performing any occupations accounting for the exertional restrictions. SSR 83-12, 1983 WL 31253 at *2–3 (S.S.A. 1983). Further, non-exertional restrictions may also limit a claimant's ability to do a full range of jobs at any exertion level, meaning no grid rule will be applicable, and the ALJ should consult a vocational expert. 20 C.F.R. § 404.1659a(d); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(d); *Titles II & XVI: Capability to Do Other Work - The Medical-Vocational Rules As A Framework for Evaluating A Combination of Exertional & Nonexertional Impairments*, SSR 83-14, 1983 WL 31254 at *4–6 (S.S.A. 1983).

As discussed, Plaintiff's exertional ability, if the limitations described in the RFC are correct and complete, is not reduced to the degree that warrants application of the sedentary Rule 201.12, but it is also more than a slight reduction from full light work and therefore, considering the additional nonexertional limits in the RFC, Rule 202.13 is also inapplicable. In this situation, the ALJ was not obligated to choose between the two rules, so the direction in POM DI 25025.015(D) did not govern.

The ALJ instead correctly followed the direction of the SSRs and POM in finding that the grid rules could not be used to determine Plaintiff's disability.  After reviewing the rules for using the grids, the ALJ found the following:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.20 and Rule 202.13. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

(R. 27.)  The ALJ consulted the vocational expert, and adopted the expert's testimony about available occupations, explained that any conflicts between the DOT and the standing/walking limits for those occupations were based on the expert's experience, and found Plaintiff capable of performing those occupations.  (R. 27.)  The ALJ satisfied her obligation to consult a vocational expert and explain the basis for her determination.

However, the Court has found *supra* that the RFC may not have been complete, and has recommended that this case be remanded with instructions to either incorporate the more specific durational standing/walking limitations into the RFC or to explain why it was excluded.  If the result of that reconsideration is to incorporate additional limitations into the RFC, then the ALJ must also consider the impact of those additional limitations on the use of the grid rules.  Further, if after doing so she concludes once again that she must seek the opinion of a vocational expert, she must include those

20

additional limitations into the hypothetical question and reconsider her step five determination in light of the resulting response.

### B.    Plaintiff's Challenge to the ALJ's Constitutional Authority to Decide Plaintiff's Disability Application

Plaintiff argues that under *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020), the position of Commissioner of the Social Security Administration (SSA) enjoys unconstitutional removal protections.  Therefore, he argues, the ALJ and the SSA Appeals Council, who derived their authority to determine Plaintiff's application from the Commissioner, lacked that authority, so the decision must be remanded to be decided by an ALJ and Appeals Council with proper authority.  (Pl's Mem. at 10.[4])  The Commissioner concedes that the structure of the Social Security Act, 42 U.S.C. § 902(a)(3), limiting the President's authority to remove the Commissioner without cause, violates constitutional separation of powers.  (Def's Mem. at 6.)  But the Commissioner advances several arguments as to why that does not justify setting aside the disability determination here.  The Court will address each of those arguments in turn.

### 1.    Whether the Circumstances of the ALJ's Appointment Obviate Plaintiff's Constitutional Challenge

The Commissioner first argues that the ALJ who denied Plaintiff's claim was appointed by *Acting* Commissioner of Social Security Nancy Berryhill, whom the

---

[4] Plaintiff argues in his reply brief that under the doctrine of constitutional avoidance, the Court need not reach this issue if the other arguments are sufficient to warrant remand. (Pl's Reply at 3 [ECF No. 31].)  Although that is theoretically true, since the decision whether to adopt the Court's recommendation that the matter be remanded on other grounds is ultimately that of the District Judge, this Court finds it appropriate to address the alternative grounds raised for remand.

President could have removed at will, so there is no actual separation-of-powers concern in Plaintiff's case. (Def's Mem. at 8–11.) Plaintiff replies that he is not raising a concern with the ALJ's appointment, but instead is challenging the authority of the ALJ at the time she decided Plaintiff's application, when she would have been acting under a delegation from the then-appointed Commissioner, Andrew Saul, who at the time of the ALJ's determination herein was unconstitutionally protected from removal. (Pl's Reply at 11–13.)

The Court agrees with Plaintiff that the applicable temporal lens through which to view the authority of the ALJ to determine Plaintiff's case is the time of the determination, not the time the ALJ was appointed. The authority of the ALJ and Appeals Council to decide Plaintiff's application was not irrevocably fixed at the time of their appointments, but instead derived from an ongoing delegation of authority from the Commissioner at the time they acted on Plaintiff's case. 42 U.S.C. § 405(b)(1) ("The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter"); 42 U.S.C. § 902(a)(7) ("The Commissioner may assign duties, and delegate, or authorize successive redelegations of, authority to act and to render decisions, to such officers and employees of the Administration as the Commissioner may find necessary. Within the limitations of such delegations, redelegations, or assignments, all official acts and decisions of such officers and employees shall have the same force and effect as though performed or rendered by the Commissioner."); HALLEX I-2-0-2(A) (explaining that an ALJ's authority to hear and decide a case is delegated from the Commissioner). Commissioner

Saul took the post on July 17, 2019, and held it until July 9, 2021. *Social Security Commissioners*, S.S.A., https://www.ssa.gov/history/commissioners.html (last visited May 25, 2022). The question, therefore, is whether *Commissioner Saul's* unconstitutional removal protections undermined his authority—acting through the ALJ and the Appeals Council—to decide Plaintiff's case.

### 2. Whether the Unconstitutional Removal Protections Caused Plaintiff Actual Harm

The Commissioner next argues that Plaintiff cannot show he is entitled to a new determination because he cannot show the unconstitutional structure of Section 902(a)(3) caused him any harm, i.e., the denial of his application. (Def's Mem. at 11.) Plaintiff responds that his injury included not just the denial of his application, but also the denial of a hearing, adjudication, and decision before an ALJ and Appeals Council with valid constitutional authority. (Pl's Reply at 8.) He contends the removal protections are a structural constitutional error requiring reversal with no need for a showing of causation, but that in any event, he has shown causation. (Pl's Reply at 13–16.)[5]

---

[5] Plaintiff argues in his reply that the Commissioner waived any defense regarding the constitutionality of the Appeals Council's authority to decide his case because the Commissioner addressed only the authority of the ALJ in its response to Plaintiff's motion. (Pl's Reply at 9–10.) But Plaintiff acknowledges the Commissioner addressed the Appeals Council in a footnote. (*Id.*) The footnote argues, "Likewise, Plaintiff cannot conceivably show that the President's supposed inability to remove the Commissioner without cause affected the Appeals Council's denial of review of his specific claim." (Def's Mem. at 13, n. 4.) Thus, the Commissioner clearly intended to convey that the same constitutional arguments presented for the ALJ also applied to the Appeals Council. Further, there is no reason to distinguish between the ALJ and the Appeals Council for the purposes of analyzing whether the Commissioner's removal protections harmed Plaintiff through the ALJ and Appeals Council actions. Plaintiff's own arguments did not distinguish between them.

In general, remedies for violations of the Constitution must be aimed at eliminating harms that flow from the violation. *Milliken v. Bradley*, 433 U.S. 267, 282 (1977). In constructing a remedy, the court must carefully consider how the constitutional violation caused the harm for which the plaintiff seeks relief, and construct a remedy only for that harm. *Id.* In cases where a plaintiff cannot link a constitutional violation to a harm, the violation is harmless error, and a court cannot grant relief. *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991); *Izaak Walton League of Am., Inc. v. Tidwell*, Case No. 06-cv-3357 (RT/LIB), 2015 WL 632140, at *17 (D. Minn. Feb. 13, 2015) (quoting *Jicarilla Apache Nation v. U.S. Dep't of Interior,* 613 F.3d 1112, 1121 (D.C.Cir.2010) ("The harmless error rule applies to agency action because if the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

But the Supreme Court recognizes a limited class of structural constitutional errors that require no showing of harm because they undermine confidence in the objectivity and fairness of a trial or adjudication, and because harm is extremely difficult to prove. *Vasquez v. Hillery*, 474 U.S. 254, 261–64 (1986). Such errors include, for example, the risk of gender and racial bias in jury selection, biased jurors or judges, and biased prosecutorial or grand jury decisions. *Id.*

          **a.**      **Whether the Removal Protections Are a Structural Constitutional Error That Requires No Showing of Harm**

Plaintiff argues that the removal protections introduced a structural error in the ALJ's and Appeals Council's adjudication of his application. In support of this position,

he points to cases addressing violations of the Constitution's Appointments Clause, in which courts described the improper appointment of administrative judges as a structural violation and required that the agency provide a new adjudication with a properly appointed judge. (Pl's Reply at 14 (citing *Cirko on behalf of Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153–54 (3d Cir. 2020); *Landry v. F.D.I.C.*, 204 F.3d 1125, 1131 (D.C. Cir. 2000)).)

But the Supreme Court rejected this argument in *Collins v. Yellen*, 141 S. Ct. 1761, 1787–88 (2021). The plaintiffs in *Collins* argued that the Federal Housing Finance Agency (FHFA) Director's removal protections violated the constitutional separation-of-powers, and that prior separation-of-powers caselaw, including Appointment Clause cases, required reversal of the Director's actions without a showing of harm. *Id.* The Court rejected the comparison to the Appointment Clause cases:

> [M]ost of the cases they cite involved a Government actor's exercise of power that the actor did not lawfully possess. See *Lucia* v. *SEC*, 585 U. S. ——, —— (2018) (slip op., at 12) (administrative law judge appointed in violation of Appointments Clause). . . . As we have explained, there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office.

*Id.* at 1788. The Court also explained:

> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id.* at 1787. *See also id.* at 1793 (Thomas, J. concurring) ("Here all the officers who

25

headed the FHFA during the time in question were properly *appointed*. There is thus no barrier to them exercising power in the first instance.") (citation and quotation omitted), 1801 (Kagan, J. concurring) ("As the majority explains, the officers heading the FHFA, unlike those with invalid appointments, possessed the authority to carry out the functions of the office.") (citation and quotation omitted).

*Collins* teaches that the difference between Appointment Clause violations and unconstitutional removal protections is that an improperly appointed government officer lacks the authority of that office, so their actions are void. But an officer properly appointed may exercise the authority of his office even though the statute purports to grant him unconstitutional removal protections. *Id.* at 1787–88. Plaintiff does not contest that Commissioner Saul was properly appointed. Therefore, Commissioner Saul had the authority through the ALJ and Appeals Council to decide Plaintiff's case. The Commissioner's unconstitutional removal protections are not a structural harm requiring automatic reversal and remand. For the same reason, Plaintiff's argument that he was harmed simply by being denied a hearing, adjudication, and decision by an ALJ and Appeals Council with proper authority must fail, as they possessed that authority.

### b. Whether Plaintiff Suffered Actual Harm As a Result of the Removal Protections

Plaintiff must instead show that the removal protections caused or allowed the only remaining harm he raises, the unfavorable disability decision. Thus, as the Supreme Court explained in *Collins,* to be entitled to relief in a case of unconstitutional removal protection, a plaintiff must show that an officer's insulation from removal in some way

26

caused or allowed the officer to harm him by, for example, blocking a President's attempt

to remove the officer before the harmful act. *See id.* at 1788–89; *see also id.* at 1801

(Kagan, J. concurring[6]) ("[P]laintiffs alleging a removal violation are entitled to

injunctive relief . . . only when the President's inability to fire an agency head affected

the complained-of decision . . . Only then is relief needed to restore the plaintiffs to the

position they 'would have occupied in the absence' of the removal problem.") (quoting

*Milliken*, 433 U.S. at 280); 1791–94 (Thomas, J. concurring) (reasoning that because the

removal protections do not make the officer's exercise of authority unconstitutional, a

plaintiff can only obtain relief when the protections allow or cause a harmful action.)

The Court in *Collins* hypothesized a President's attempt to remove an officer who

subsequently harms a plaintiff, or an officer who purports to act with authority despite a

President removing him. Justice Kagan's concurrence considered the example of Social

Security disability decisions:

> Consider the hundreds of thousands of decisions that the Social
> Security Administration (SSA) makes each year. . . . [G]iven
> the majority's remedial analysis, I doubt the mass of SSA
> decisions—which would not concern the President at all—
> would need to be undone. That makes sense. "[P]residential
> control [does] not show itself in all, or even all important,
> regulation." Kagan, Presidential Administration, 114 Harv. L.
> Rev. 2245, 2250 (2001). When an agency decision would not
> capture a President's attention, his removal authority could not
> make a difference—and so no injunction should issue.

*Id.* at 1802.

---

[6] Justices Sotomayor and Breyer joined this part of Justice Kagan's concurrence. *Id.* at
1803, n. 1.

Plaintiff argues he is able to show harm because but-for the unconstitutional delegation of authority to the ALJ and Appeals Council, they never could have adjudicated his application. (Pl's Reply at 15–16.) But as discussed above, these officers had constitutional authority to adjudicate his application. Plaintiff offers no other arguments regarding causation. The Court notes also that at the time Plaintiff's application was decided, President Trump, who had appointed Commissioner Saul, was still in office, and Plaintiff points to no instance of the President expressing a desire to remove Commissioner Saul, let alone any attempt to do so. In short, the Court finds that Plaintiff has failed to show any causal link between the unconstitutional removal protection and the denial of his application. This reasoning and result align with the decisions of other courts in the Eighth Circuit that have considered the issue. *See, e.g., Jean P. v. Kijakazi*, No. 8:21-CV-200, 2022 WL 1505797, at *14 (D. Neb. May 12, 2022); *Lisa D. v. Kijakazi*, No. 8:21-CV-294, 2022 WL 952778, at *7 (D. Neb. Mar. 30, 2022); *Watt v. Kijakazi*, No. 4:21-CV-00030 (LPR/JTK), 2022 WL 798337, at *5 (E.D. Ark. Mar. 10, 2022); *Alice T. v. Kijakazi*, No. 8:21-CV-14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021). Therefore, the Court does not recommend that this matter be reversed and remanded on the basis of this harmless constitutional error.[7]

### 3.    The Commissioner's Other Arguments

Although the above discussion disposes of Plaintiff's constitutional argument, the

---

[7] Though *Collins* does not use the language of harmless constitutional error, the Commissioner persuasively argues that the case's position on the availability of a remedy for unconstitutional removal protections tracks with the Supreme Court's jurisprudence on harmless error. (Def's Mem. at 15–16.)

Court will briefly address alternative arguments raised by the Commissioner.

The Commissioner argues that if the removal protections robbed the Commissioner (and his delegated officers) of the authority to determine Plaintiff's application, it robbed that authority from all ALJs, leaving no one to decide Plaintiff's application and denying him the ability to gain benefits; therefore, the Rule of Necessity provides a reason to not reverse. (Def's Mem. at 18–19.) Plaintiff counters that there was no necessity because the government itself created the unconstitutional conditions and failed to remedy them, and the Commissioner could step aside for an Acting Commissioner to take over. (Pl's Reply at 20.)

The Rule of Necessity "allows a judge, normally disqualified, to hear a case when the case cannot be heard otherwise." *Glick v. Edwards*, 803 F.3d 505, 509 (9th Cir. 2015) (quotation omitted) (citing *Ignacio v. Judges of the U.S. Court of Appeals for the Ninth Circuit,* 453 F.3d 1160, 1164 (9th Cir.2006)). The Rule of Necessity operates to ensure that a claimant can have his statutory or constitutional right to an adjudication vindicated in circumstances when disqualification of all adjudicators would leave them with no such opportunity. *United States v. Will*, 449 U.S. 200, 213–16 (1980). The rule is most often invoked when a decision-maker is presumptively biased because of some personal interest in the outcome of an adjudication, but all others authorized to adjudicate the issue share that disqualifying interest. *See, e.g., F.T.C. v. Cement Inst.*, 333 U.S. 683, 700–03 (1948) (holding that FTC commissioners could adjudicate claims that a certain business practice was an illegal restraint of trade even though they had previously expressed official positions that the practice was illegal, because only they were

29

authorized to decide the case); *Will*, 449 U.S. at 211–17 (holding that the Rule of Necessity permitted federal judges to adjudicate claims involving the Compensation Clause and legislation for paying federal judges even though all had an interest in the outcome, because if all recused there would be no one to adjudicate the claims). The Supreme Court has suggested that the rule may apply when all adjudicators are disqualified by a common constitutional flaw in their authority. *See Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055, n. 5 (2018) (reasoning in *dicta* that if all SEC ALJs were disqualified from adjudicating a case due to an agency-wide Appointment Clause violation, the Rule of Necessity would "presumably kick in" to allow the SEC to do the hearing.)

Plaintiff argues the rule should not apply when the government itself failed to remedy the unconstitutional protections, but the Court has seen no caselaw suggesting that as an exception, nor does it follow that *Congress's* failure to excise the removal protections from the statute obviates the necessity for the SSA to decide disability applications. Indeed, all of those individuals whose applications were processed and benefits granted by SSA ALJs and Appeals Councils while the removal protections were in place would argue there was a great necessity for the SSA to do precisely that.

Plaintiff's argument that there is no necessity because the constitutional defect could be remedied if the Commissioner steps aside for an Acting Commissioner who could be removed at-will is also unavailing. (Pl's Reply at 20.) Plaintiff's reasoning is essentially that the rule is not needed when the disqualified officer can resign his position and be replaced by another. But the rule exists to avoid the need for conflicted officers to resign and the ensuing delays and disruptions to adjudications that attend the process of

replacing the officer. It says, in effect, that if all the *currently appointed* officers are

disqualified, then none are because someone must adjudicate the claimant's claim.

> It is well established that actual disqualification of a member
> of a court of last resort will not excuse such member from
> performing his official duty if failure to do so would result in a
> denial of a litigant's constitutional right to have a question,
> properly presented to such court, adjudicated.

*Will*, 449 U.S. at 214 (quoting *State ex rel. Mitchell v. Sage Stores Co.*, 157 Kan. 622,

629 (1943). The Commissioner faces the choice to resign and prevent Plaintiff's case

from moving forward until a new Acting Commissioner steps in and grants the SSA ALJs

proper authority, or to adjudicate the case despite the lack of authority because no one

else can. The Rule of Necessity required the Commissioner (and therefore the ALJ and

Appeals Council) to adjudicate the claim. Thus, the Rule of Necessity provides an

alternative basis for concluding this case need not be remanded on account of the

unconstitutional removal protections.

## RECOMMENDATION

The Court respectfully recommends that:

1. Plaintiff's Motion for Summary Judgment [ECF No. 27] be **GRANTED**;

2. Defendant's Motion for Summary Judgment [ECF No. 29] be **DENIED**; and

3. The final decision of the Commissioner of Social Security be **REVERSED** and

   the case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with

   the directive to reconsider whether additional limitations on standing/walking

   consistent with the opinions of Dr. Jankus and Dr. Benton should be included in

   the RFC and, if not, to explain their omission; (2) if necessary, to put a new

hypothetical question to the vocational expert; and (3) based on the resulting

testimony, to reassess at step five whether Plaintiff can do work in the national

economy; and that

4. **JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 6, 2022                     _s/ Hildy Bowbeer_
                                        HILDY BOWBEER
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).